**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**MARY J. BAILEY,**

      **Plaintiff,**

        **v.**

**WASHINGTON METROPOLITAN**
**AREA TRANSIT AUTHORITY** *et al.***,**

      **Defendants.**

**Civil Action No.  09-1027 (JEB)**

**MEMORANDUM OPINION**

Plaintiff Mary Bailey is a white female employed by Defendant Washington Metropolitan Area Transit Authority who suffers from an anxiety disorder.  Her initial suit against WMATA included claims of race, age, and disability discrimination. As her causes of action under the Americans with Disabilities Act and the Age Discrimination in Employment Act have since been dismissed, her remaining claims are twofold. First, she alleges Defendant discriminated against her because of her race and disability when it declined to offer her a promotion.  Second, she contends that Defendant retaliated against her for complaining about discrimination by offering her a severance package.  The parties have now filed Cross-Motions for Summary Judgment.  Because no reasonable jury could find that Defendant's stated reason for its hiring decision was pretextual and because Plaintiff did not suffer an adverse employment action in the severance episode, the Court will grant Defendant's Motion.

I.      **Background**

Plaintiff has been employed by Defendant in various capacities within the human resources department since 2001.  See Def.'s Mot., Exh. 6 (Pl.'s Dep.) at 12; First Am. Compl., ¶

2.  She has been diagnosed with and receiving treatment for generalized anxiety for twenty years. First Am. Compl., ¶ 10.  In addition, she was "treated for thyroid cancer in 1989 and since that time has been taking [a] daily dose of thyroid hormone replacement medication. Her doctors have discovered that during the time in question her thyroid hormone level was very high, which causes emotional behavior." Id.  Indeed, Plaintiff has suffered "anxiety attacks at work where she would lose control of her emotions and would frequently cry and tremble." Id.

In November 2007, Defendant hired Delecia Sampson, a black female, as Chief of Workforce Client Services.  Def.'s Mot., Exh. 7 (Dep. of Delecia Sampson) at 14; First Am. Compl., ¶ 5.  In March 2008, Sampson terminated one of the Supervisors in the HR department, Robert McFerron, leaving a vacancy.  Id., ¶ 7; Sampson Dep. at 30. The terminated employee had suggested to Sampson that Plaintiff could take his place, First Am. Compl., ¶ 7; Pl.'s Dep. at 20-21, but Sampson nevertheless appointed Lora Wright, a black female, to the vacant Supervisor position. First Am. Compl., ¶ 3.  Sampson unilaterally promoted Wright to the Supervisor position without posting the vacancy and opening the position to competition, as is required by WMATA internal guidelines.  Id., ¶¶ 7-8.  Plaintiff complained to the Inspector General's Office about Sampson's failure to adhere to the guidelines, and Sampson issued a statement acknowledging the lapse and retracting her appointment of Wright.  See id., ¶ 8.

Sampson then posted the position to the employees in the department, opening it to competition.  Id.  The posting, however, was made more narrowly and for a shorter time than WMATA's internal guidelines require.  See id; Pl.'s Dep. at 24; Pl.'s Mot. and Opp. at 3. Plaintiff and Wright were the only two applicants.  See Sampson Dep. at 51.  Both candidates interviewed in front of a panel of individuals selected by Sampson, see id.: 1) Sampson herself; 2) Andrea Burnside, "a white female who was Ms. Sampson's supervisor"; 3) Gary Baldwin, "a

white male who was the Human Resources Director for Client Services"; 4) Deborah Coram, a black female who worked in the Office of Civil Rights; and 5) Kim Thompson, "a white female who was the Executive Assistant for the head of Rail transportation, David Kubicek." Def.'s Mot. at 4 (citing Pl.'s Dep. at 24-27).  Sampson stated she selected panelists from "all areas of HR," hoping to represent "a broad spectrum of opinions."  Sampson Dep. at 51.

The panel asked both applicants the same ten questions, and the panelists each scored both applicants out of 100 points. See id. at 52; Pl.'s Dep. at 26. Four of the panelists scored Wright higher than Plaintiff; one panelist scored the two candidates equally. Def.'s Mot. at 5. Wright was selected to fill the vacancy.  First. Am. Compl., ¶ 9. Defendant explains its decision as follows: "The panel scored Ms. Wright higher than Plaintiff and Ms. Wright better answered the questions in regard to strategic partnering with the client office." Def. Mot. at 16 (citing Def. Mot., Exh. B (Dep. of Andrea Burnside) at 25). In addition, Defendant states that "the panel felt Ms. Wright conducted herself more impressively during the interview, and selected Ms. Wright as the better candidate to interface with Mr. Kubicek." Id.

After being passed over for the promotion, Plaintiff complained to Jim Wynne, the Director of Civil Rights, about the selection process and the panel's decision, alleging that she had been treated in a discriminatory fashion.  First Am. Compl., ¶ 11.  "Wynne worked out an arrangement for Plaintiff to work on the Client Services Team for Bus Service in Landover, Maryland."  Id.

Approximately two weeks after Plaintiff started work in Landover, Sampson requested a meeting with her during which Sampson "stated that she believed Plaintiff Bailey was unable to control her emotions at work, was not happy and was not expressing support for her new organization." Id., ¶ 12.  Sampson offered Plaintiff a severance package, which Plaintiff

declined.  Pl.'s Dep. at 55-56.  Plaintiff discussed the offer and the events surrounding it with some friends and, shortly thereafter, received an email from Sampson "informing her that she was engaging in disruptive and gossipy conduct."  First Am. Compl., ¶ 12. Plaintiff again contacted Wynne, the Civil Rights Director, about what she believed to be "discrimination and unfair treatment."  Id.  Wynne "was not responsive."  Id.

Plaintiff then filed a claim with the Equal Employment Opportunity Commission on August 20, 2008, alleging discrimination on the basis of age, race, and disability.  See Def.'s Mot., Exh. A (Charge of Discrimination).  The EEOC ultimately issued Plaintiff a Notice of Right to Sue. First Am. Compl., ¶ 14.  Plaintiff filed this suit on June 2, 2009, and filed an Amended Complaint on July 31, 2009.  She alleged violations of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and the Rehabilition Act.  See id., ¶¶ 15-33.  Though Plaintiff initially named both WMATA and Sampson as Defendants, id., ¶ 3, Sampson was never served, and the case has not proceeded against her.  See Def.'s Mot. at 1, n.1.  Defendant subsequently filed a Motion to Dismiss, and Judge Ricardo Urbina, to whom this case was previously assigned, dismissed Plaintiff's ADA and ADEA claims on March 17, 2010.  See Bailey v. WMATA, 696 F. Supp. 2d 68, 71 n.5 (D.D.C. 2010).  After discovery, both parties moved for summary judgment on the remaining claims.[1]

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v.

---

[1] In considering both parties' summary judgment motions, the Court has reviewed both parties' Motions, Oppositions, and Replies.

Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  Holcomb, 433 F.3d at 895; Liberty Lobby, Inc., 477 U.S. at

248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, Inc.,

477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion by citing to particular parts of materials in the

record."  FED. R. CIV. P. 56(c)(1)(A).

        The party seeking summary judgment "bears the heavy burden of establishing that the

merits of his case are so clear that expedited action is justified."  Taxpayers Watchdog, Inc., v.

Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987).   When a motion for summary judgment is under

consideration, "the evidence of the non-movant[s] is to be believed, and all justifiable inferences

are to be drawn in [her] favor."  Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. PEPCO,

447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288

(D.C. Cir. 1998) (en banc).  On a motion for summary judgment, the Court must "eschew

making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360,

363 (D.C. Cir. 2007).

        The nonmoving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations, or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is

required to provide evidence that would permit a reasonable jury to find in its favor.  Laningham

v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the nonmovant's evidence is

"merely colorable" or "not significantly probative," summary judgment may be granted. <u>Liberty Lobby, Inc.</u>, 477 U.S. at 249-50.

## III.   Analysis

Three claims remain in this case: (1) that, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), Defendant retaliated against Plaintiff for expressing her belief that she had been discriminated against; (2) that Defendant discriminated against her on the basis of disability in violation of the Rehabilitation Act, 29 U.S.C. § 794(a); and (3) that Defendant discriminated against her on the basis of race in violation of Title VII, 42 U.S.C. § 2000e-2(a). The Court will address each in turn.

### A.  <u>Retaliation</u>

As a preliminary matter, Plaintiff contends that Defendant is barred from seeking summary judgment on the retaliation claim under the law-of-the-case doctrine. <u>See</u> Pl.'s Mot. and Opp. at 7.  Plaintiff insists that Defendant "previously moved the Court to dismiss this claim, and the Court did not grant its motion.  The Court's refusal to grant Defendant's motion thus constitutes the law of the case, and Defendant cannot be heard to advance the same argument a second time." <u>Id.</u> (citation omitted).

Such a position is clearly belied by Judge Urbina's March 17, 2010, Memorandum Opinion.  As Defendant rightly points out, <u>see</u> Def.'s Opp. and Reply at 4, Judge Urbina explicitly stated that he did <u>not</u> rule on the retaliation issue at the motion-to-dismiss stage:

> WMATA also moved to dismiss the plaintiff's claim of
> Retaliation, <u>see</u> Def.'s Mot. at 5-6, but later withdrew that portion
> of its motion, electing instead to pursue that argument following
> discovery, <u>see</u> Def.'s Reply at 1 n.1.  Accordingly, the court will
> not address the plaintiff's retaliation claim.

Bailey v. WMATA, 696 F. Supp. 2d 68, 71 n.5 (D.D.C. 2010).  Plaintiff's suggestion that

Defendant is precluded from seeking summary judgment is thus entirely misplaced.

 Title VII provides, in relevant part, that it is unlawful for an employer "to discriminate

against any of [its] employees . . . because [she] has made a charge . . . or participated in any

manner in an investigation" of discrimination.  42 U.S.C. § 2000e-3(a).  "In order to prevail upon

a claim of unlawful retaliation, an employee must show 'she engaged in protected activity, as a

consequence of which her employer took a materially adverse action against her.'"  Taylor v.

Solis, 571 F.3d 1313, 1320 (D.C. Cir. 2009) (quoting Weber v. Battista, 494 F.3d 179, 184 (D.C.

Cir. 2007)).  "[A] 'materially adverse' action for purposes of a retaliation claim is one that 'could

well dissuade a reasonable worker from making or supporting a charge of discrimination.'"

Gaujacq v. EDF, Inc., 601 F.3d 565, 577 (D.C. Cir. 2010) (quoting Burlington Northern & Santa

Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)).

 Plaintiff initially suggested in her First Amended Complaint that she suffered a materially

adverse employment action when "she was transferred to Landover, Maryland to work as a

recruiter for bus operators."  First Am. Compl., ¶ 24.  Plaintiff, however, appears to have

abandoned this theory, since it appears nowhere in her briefs. Instead, she now argues that the

adverse action occurred when "Sampson attempted to force her to resign" by offering her a

severance package and then questioned her about "projects she was expected to work on."  Pl.'s

Reply at 4.

 Such an allegation is plainly insufficient to prevail here because no reasonable jury could

find that the proffer of a severance package and resulting discussion constituted a materially

adverse employment action.  "To establish an adverse personnel action in the absence of

diminution of pay or benefits, plaintiff must show an action with 'materially adverse

consequences affecting the terms, conditions, or privileges of employment.'" Stewart v. Evans, 275 F.3d 1126 (D.C. Cir. 2002) (quoting Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999)); see also Walker v. WMATA, 102 F. Supp. 2d  24, 29 (D.D.C. 2000) ("An employment decision does not rise to the level of an actionable adverse action . . . unless there is a 'tangible change in the duties or working conditions constituting a material employment disadvantage.'" (quoting Kilpatrick v. Riley, 98 F. Supp. 2d 9, 10 (D.D.C. 2000))).  Despite styling the offer of the severance package as an "attempt[] to force her to resign," Pl.'s Reply at 4, Plaintiff simply has not identified any adverse action taken because she declined to accept it.  In other words, Plaintiff lost no benefit, no salary, and no leave in connection with the severance offer.  Plaintiff, moreover, points to no threats, implicit or explicit, connected with Defendant's offer. And while Plaintiff may well have found it uncomfortable to "come up with a list of projects" she wanted to work on and "stat[e] how [she] would make a positive contribution," Pl.'s Reply at 4 (quoting Pl.'s Dep. at 54-56), this is the type of work typical employees are required to do every day. Even if they were not, such "petty slights [and] minor annoyances" do not rise to the level of a materially adverse employment action.  Burlington Northern, 548 U.S. at 68.

Because no reasonable jury could find that the severance-package offer and resulting discussion constituted "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm," Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002), Plaintiff's retaliation claim cannot survive summary judgment.

B.  Disability Discrimination

In addition to retaliation, Plaintiff alleges she was discriminated against on the basis of her disability.  The Rehabilitation Act provides that "[n]o otherwise qualified individual with a

disability . . . shall, solely by reason of her or his disability,  . . . be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency."  29 U.S.C. § 794(a).  To withstand summary judgment on a disability-discrimination claim under the Rehabilitation Act, Plaintiff "must produce enough evidence to allow a reasonable jury to conclude that [s]he (1) has a disability; (2) was qualified to perform the essential functions of employment with or without reasonable accommodation; and (3) suffered an adverse employment decision due to [her] disability." Desmond v. Mukasey, 530 F.3d 944, 952 (D.C. Cir. 2008) (citing Duncan v. WMATA, 240 F.3d 1110, 1114 (D.C. Cir. 2001) (*en banc*)).  As with her retaliation claim, therefore, Plaintiff must demonstrate that a reasonable jury could conclude that she suffered an adverse employment action in order to proceed on her disability discrimination claim.  See Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

Plaintiff's First Amended Complaint suggested three potential adverse employment actions in connection with her disability-discrimination claim: Sampson (1) failed to promote Plaintiff, (2) "later requested that [she] resign her position," and (3) "transferred her to Landover, Maryland."  Id., ¶ 33.  In her pleadings here, however, Plaintiff appears to have abandoned the first and third theories, neither of which was argued in any of her briefs. Indeed, Plaintiff conceded in her deposition that she did not believe she was discriminated against on the basis of disability when she failed to obtain the promotion to the Supervisor position:

> Q.      Do you feel that there was discrimination based on disability with respect to the position that was filled by Lora Wright that we talked about at length?
>
> A.      No.

Pl.'s Dep. at 51-52.  Instead, Plaintiff's briefs rely solely on the theory that Defendant's offer of a severance package and the discussions that followed – what Plaintiff labels "Defendant['s] attempt[] to force her to resign" -- constituted an adverse employment action.  See Pl.'s Mot. and Opp. at 18-19; Pl.'s Reply at 9.

As discussed in detail in Part III.A, *supra*, however, the offer of a severance package and the requirement that Plaintiff discuss the projects on which she intended to work in the future do not, as a matter of law, constitute an adverse employment action.  Indeed, "[a]s the Supreme Court recently explained, Title VII's retaliation provision 'cover[s] a broad range of employer conduct' that extends beyond the statute's substantive antidiscrimination provision."  Rattigan v. Holder, 643 F.3d 975, 986 (D.C. Cir. 2011) (quoting Thompson v. N. Am. Stainless, LP, 131 S.Ct. 863, 868 (2011)) (second alteration in original); see also Gaujacq v. EDF, Inc., 601 F.3d 565, 577 (D.C. Cir. 2010).  If the severance package and discussion do not constitute adverse employment action for the purpose of Plaintiff's retaliation claim, *a fortiori*, they do not constitute such for her discrimination claim.

C.  Race Discrimination

Plaintiff last sets forth a claim of race discrimination in connection with her failure to be promoted.  Title VII makes it unlawful for an employer to "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a). "This statutory text establishes two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race . . . ."  Brady v. Office of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008).  It is undisputed that Plaintiff suffered an adverse

employment action when she failed to obtain a promotion to the Supervisor position; the only

question remaining, therefore, is whether this occurred "because of" her race.

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court laid out

the familiar three-step, "burden-shifting approach to employment discrimination claims in cases

where the plaintiff lacks direct evidence of discrimination." Chappell-Johnson v. Powell, 440

F.3d 484, 487 (D.C. Cir. 2006). If "an employer has asserted a legitimate, non-discriminatory

reason" for its employment decision, however, the Court utilizes a more streamlined analysis:

> [I]n considering an employer's motion for summary judgment or
> judgment as a matter of law in those circumstances, the district
> court must resolve one central question: Has the employee
> produced sufficient evidence for a reasonable jury to find that the
> employer's asserted non-discriminatory reason was not the actual
> reason and that the employer intentionally discriminated against
> the employee on the basis of race, color, religion, sex, or national
> origin?

Brady, 520 F.3d at 494. Our Circuit has eschewed focusing on the McDonnell "*prima-facie*

case" inquiry in favor of this more streamlined approach even in so called "reverse-

discrimination cases" involving alleged discrimination against white individuals. See, e.g.,

Ginger v. District of Columbia, 527 F.3d 1340, 1344 (D.C. Cir. 2008).

It is beyond dispute here that Defendant has offered a legitimate, nondiscriminatory

reason for choosing Wright over Plaintiff: "The panel scored Ms. Wright higher than Plaintiff

and Ms. Wright better answered the questions in regard to strategic partnering with the client

office." Def. Mot. at 16 (citing Burnside Dep. at 25). In addition, Defendant states that "the panel

felt Ms. Wright conducted herself more impressively during the interview, and selected Ms.

Wright as the better candidate to interface with Mr. Kubicek." Def. Opp. and Reply at 10.

Because Defendant has asserted a legitimate, nondiscriminatory reason for selecting

Wright, the Court now must determine whether Plaintiff has "produced sufficient evidence for a

reasonable jury to find [this] reason was not the actual reason and that the employer intentionally discriminated against the plaintiff . . . ."  Adeyemi v. District of Columbia, 525 F.3d 1222, 1226 (citing Brady, 520 F.3d at 493-95).  In attempting to demonstrate that Defendant's stated reason for choosing Wright over her is pretextual, Plaintiff proffers three primary arguments: (1) "that Ms. Wright falsified her application"; (2) "that Ms. Bailey was more qualified for the position than Ms. Wright"; and (3) that "Ms. Sampson engineered the selection process specifically to place Ms. Wright into the position."  Pl.'s Mot. and Opp. at 11-12.  The Court will consider each.

### 1. *Wright's Falsified Application*

Plaintiff first attempts to show Defendant's proffered explanation for promoting Wright over Plaintiff is pretextual by contending that Wright falsified her application in certain respects. Id. at 12.  Namely, Plaintiff suggested that Wright's claim that she possessed a college degree was "highly suspect," id., and contended that she "misrepresent[ed] her work as an HR Generalist III on her resume" when she stated "that she had seven years as an HR Generalist III, though she had been in the position for less than six months." Pl.'s Reply at 7.  Defendant contests these allegations, attempting to explain Sampson's statement regarding the HR Generalist III position, see Def.'s Opp. and Reply (Aff. of Lora Wright) at ¶ 2, and producing a copy of Wright's college diploma.  See id., Exh. 1.  But even if accurate, Plaintiff's claims are irrelevant.  Absent some evidence that the decisionmakers were aware – or, at the very least, should have been aware – of the alleged misrepresentations, they have nothing to do with Defendant's motives.  In other words, if WMATA believed that Wright's credentials were authentic, then their purported falsification was never considered as a factor in the selection process.  In determining whether a reasonable jury could find pretext, the Court accordingly gives no weight to Plaintiff's suggestion that Wright falsified her application.

### 2. *Plaintiff Was More Qualified*

In examining Plaintiff's second argument – that she was more qualified than Wright -- the Court bears in mind that where, as here, an employer's legitimate, nondiscriminatory reason "rel[ies] heavily on subjective considerations," the Court must treat it with caution. Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1298 (D.C. Cir. 1998) (*en banc*). Evidence that Plaintiff was better qualified, however, does not suffice to support an inference of discrimination; rather, a jury must be able to find Plaintiff was "significantly better qualified for the job" than Wright. Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006). The difference must be "great enough to be inherently indicative of discrimination." Id. Only then could a jury "legitimately infer that the employer consciously selected a less-qualified candidate -- something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." Aka, 156 F.3d at 1294. "In a close case, a reasonable [fact-finder] would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." Id. at 1294. Deference to the employer is therefore appropriate in close cases because otherwise the Court would function as "a super-personnel department that reexamines an entity's business decisions – a role which [the D.C. Circuit has] repeatedly disclaimed." Jackson, 496 F.3d at 707 (internal quotation marks omitted).

In this case, a reasonable jury could not find that Plaintiff possessed the "stark superiority of credentials" over Wright that can give rise to an inference of pretext. Stewart v. Ashcroft, 352 F.3d 422, 429 (D.C. Cir. 2003). Even with the benefit of all inferences from the evidentiary record, Plaintiff can only demonstrate that, at best, she was slightly more qualified for the Supervisor position. "It is well-settled that plaintiff may not overcome a legitimate exercise of

defendant's nondiscriminatory business judgment regarding an applicant simply by showing that she may be equally, or slightly more, qualified." Armstrong v. Jackson, 2006 WL 2024975 at *8 (D.D.C. July 17, 2006) (citing Holcomb, 433 F.3d at 897).

"In evaluating the alleged qualifications gap, the Court must assess the qualifications necessary for the position at issue, rather than considering the candidates' qualifications in a vacuum." Alford v. Providence Hospital, 2011 WL 2341096 at *4 (D.D.C. 2011). Under the heading "Minimum Qualifications and Experience," the Job Description for the Supervisor position provides:

> This is a senior CLVS HRG position with front line supervisory responsibilities.  Candidates must possess specialized multifunctional HR experience.  Position requires regular strategic client engagement.  Candidates assigned to this level will identify and resolve strategic issues following established policies and procedures. Must be able to work autonomously while collaborating with functional HR leadership.  Demonstrated experience effectively motivating and directing staff.
>
> Bachelors required in a related field with 10+ years of functionally relevant experience.  Previous supervisory and/or work guidance experience.  SPHR and/or Masters preferred.  Functional certifications appropriate.
>
> 12+ years of relevant HR work experience will be considered in lieu of a BS if candidate can effectively demonstrate progressively responsible and diversified experience and capability in at least two human resource functional areas.

Pl.'s Mot. and Opp., Exh. D (WMATA Job Description, November 21, 2007).

The Job Description also contains a section headed, "Knowledge, Skills, and Abilities":

> Existing working knowledge of or the capability to rapidly acquire and consistently and effectively demonstrate:
> • Thorough knowledge of the principles, practices and strategies of human resources and ability to rapidly acquire a thorough

knowledge of the laws, ordinances, regulations, etc. which govern
the human resources and related activities of the Authority
- Strong business acumen and understanding of the HR strategic
partnership in driving business results
- Understanding of the Authority's collective bargaining
agreements and ability to provide interpretations and guidelines
regarding the application of those agreements and integrate them
into the human resources program
- Ability to establish and maintain effective working
relationships with other offices of the Authority, governmental
agencies, labor organizations, and other individuals or organization
with whom interface may be required
- Excellent interpersonal communications skills
- Creative problem solving with strong attention to detail,
organization, and follow-up skills
- Ability to influence and affect positive change management
strategies
- Solid integrity and demonstrated ability to work with all levels
of the organization and maintain high levels of confidentiality
- Strong working knowledge of email and associated standard
office applications including word processing, spreadsheet and
database management/maintenance.

Id.

       Despite Plaintiff's suggestion to the contrary, both applicants had a college degree. See

Pl.'s Mot. and Opp. at 12; Wright Aff., Exh. 1.  Plaintiff had "over ten years of experience as a

Human Resources Generalist." Pl.'s Mot. and Opp. at 3 (citing Pl.'s Dep. at 19-20).  Wright had

been serving in a position with similar functions to those served by Human Resources

Generalists for seven years.  See Wright Aff., ¶ 2.  Plaintiff had "nearly twenty years of

experience in HR," Pl.'s Mot. and Opp. at 3 (citing Pl.'s Dep. at 19-20); Wright had

approximately twenty-two years of experience in HR, see Def.'s Opp. and Reply at 10

(emphasizing that Wright's resume, Pl.'s Mot., Exh. F (Wright Resume), "details [her]

experience in the human resources area dating back to 1986").  Plaintiff, however, was certified

as a Senior Professional in Human Resources, which is listed as a "preferred" qualification,

while Wright was not. First Am. Compl., ¶¶ 4-5; Pl.'s Mot. and Opp., Exh. E (Dep. of Lora

Wright), at 9.  Plaintiff also "had over six years of supervisory experience and had served as

team lead for over two years on one of the largest teams at WMATA."  First Am. Compl., ¶ 9.

With respect to these facts, a jury could plausibly find that Plaintiff had slightly more experience

than Wright.

The Job Description makes clear, however, that human relations and communications

skills are particularly important for the Supervisor position.  In particular, it identifies: "regular

strategic client engagement," "collaborati[on] with functional HR leadership," "experience

effectively motivating and directing staff," "[a]bility to establish and maintain effective working

relationships," "[e]xcellent interpersonal communications skills," and "demonstrated ability to

work with all levels of the organization" among the qualifications and skills required for the

position. In this area, even viewing the evidence in the light most favorable to Plaintiff, Wright

was at least as qualified – and likely better so – than Plaintiff.

Sampson "frequently would have feedback from others that [Plaintiff] had been rude or

belittled or downplayed their contributions"; she also received "feedback from the clients that

[Plaintiff] was expressing her unhappiness about the new organizational restructure to them,

saying very negative comments about the new organization and the individuals in it." Sampson

Dep. at 33.  Such feedback would naturally raise questions about Plaintiff's possessing the

interpersonal skills listed in the Job Description and enumerated above.  By contrast, Sampson

did not recall having "receive[d] any complaints from any of the clients of Lora Wright."  Id. at

32.

Wright also scored significantly better in the candidates' interviews.  Four of the panelists

rated Wright higher than Plaintiff, while one panelist scored the two candidates equally.  Def.'s

Mot. at 5.  No panelist, therefore, preferred Plaintiff to Wright.  The testimony of the panelists,

16

moreover, indicates that the panel weighted interpersonal skills heavily. Panelist Thompson, for

example, emphasized her belief that Wright would be better able to interface with Kubicek, a

white male and the head of the client office the selectee would be serving:

> My memory seems to recall that I said that I thought Lora's
> personality would be a better fit with my boss, Dave Kubicek, who
> was at the time the Assistant General Manager for Rail Operations
> and Delivery.
>
> The dialogue mostly focused on levels of confidence and fit with
> Dave Kubicek, and I feel that there was a general consensus at the
> table that Lora was more of a good fit, personality-wise for Dave.

Def.'s Mot., Exh. 8 (Dep. of Kim Thompson) at 11.  And panelist Burnside suggested that

Wright better answered "a question about strategic partering," which was "where [she] found a

big difference." Burnside Dep. at 24.

Given the evidence establishing that Wright was equally or better qualified with regard to

interpersonal and communication skills and the panel's clear evaluation of Wright as superior, no

jury could find Plaintiff more than slightly better qualified than Wright.  Indeed, a jury could

easily find her less so.  The contrast between Plaintiff's and Wright's qualifications for the

Supervisor position was simply not "great enough to be inherently indicative of discrimination."

Jackson, 496 F.3d at 707 (internal quotation marks omitted); see also Benjamin v. Duncan, 694

F. Supp. 2d 1, 7 (deferring to employer's decision where decisionmaker believed selectee's prior

work experience demonstrated his "communicati[on] and people skills" while decisionmaker and

other employees believed plaintiff was difficult to work with); cf. Aka, 156 F.3d at 1296 (finding

evidence of qualifications gap sufficient to defeat summary judgment where the plaintiff had

nineteen years of relevant work experience, while selectee had two months of volunteer

experience).  At the end of the day, Plaintiff "cannot defeat summary judgment simply by

pointing to 'small differences in the qualifications of the candidates' or identifying a situation in

which the 'employer simply made a judgment call.'" Benjamin, 694 F. Supp. 2d at 7 (quoting

Barnette, 453 F.3d at 518). Plaintiff, therefore, has failed to raise an inference of pretext based

on her allegedly superior qualifications.

### 3.   Manipulated Hiring Process

Finally, Plaintiff claims that Sampson "manipulated the selection process to cause the

selection of Wright for the position." First Am. Compl., ¶ 19. Plaintiff contends that (1)

Sampson deviated from WMATA internal policies requiring the posting of vacancies both when

she initially hired Wright without posting the vacancy and when she later posted the vacancy to a

narrower audience and for a shorter period of time than usual; (2) Sampson "stacked the

interview panel with her direct reports and employees who were aware of Ms. Bailey's prior

complaint regarding Sampson's placement of Wright into the position"; and (3) "Sampson

discussed the selection with the panelists." Pl.'s Reply at 4-5. No reasonable jury could conclude

that Defendant's proffered promotion explanation is pretextual on the basis of these largely

unsupported allegations.

Unless it is "probative . . . in determining the true motivation behind the hiring decision,"

"a finding of a failure on the part of the . . . employer to follow its own regulations and

procedures, alone, may not be sufficient" to demonstrate pretext. Johnson v. Lehman, 679 F.2d

918, 922 (D.C. Cir. 1982). While Sampson admittedly failed to follow internal guidelines

regarding the posting of vacancies when she initially hired Wright, Plaintiff produces no

evidence suggesting that this was anything more than an oversight. Plaintiff does not suggest

that Sampson was aware of the internal policy regarding posting vacancies when she unilaterally

appointed Wright, and she acknowledges that Sampson retracted the appointment after she

learned of it. Sampson, moreover, stated that she believed she had the authority to appoint

Wright unilaterally: "Where I come from, that's something that a leader has a discretion to be able to do." Sampson Dep. at 43.

Even if Sampson's premature selection of Wright influenced her decision during the official selection process – which Plaintiff has not explicitly argued -- courts have not found even an express pre-selection to necessarily be suggestive of discrimination. See, e.g., Oliver-Simon v. Nicholson, 384 F. Supp. 2d 298, 312 (D.D.C. 2005) ("[P]rocedural irregularities, pre-selection, [and] favoritism in the selection process" do not establish pretext "absent some actual evidence that defendant acted on a motivation to discriminate against plaintiff based on her age, race, or sex."); Tolson v. James, 315 F. Supp. 2d 110, 118 (D.D.C. 2004) ("Pre-selection does not violate Title VII unless it is based on discriminatory motives."). As a matter of practicality, some degree of pre-selection can be expected if a selection is to be made from among a small group of current employees well known to the decisionmaker.

Plaintiff also emphasizes that Sampson deviated from normal WMATA policy when she ultimately posted the vacancy only to the HR department – as opposed to the entire company -- and for less than ten days. See Pl.'s Dep. at 24. While an "unexplained inconsistency can justify an inference of discriminatory motive," Lathram v. Snow, 336 F.3d 1085, 109 (D.C. Cir. 2003), Plaintiff has not shown that Sampson's small deviation from WMATA's usual procedures regarding vacancies was "so irregular or inconsistent with [WMATA's] established policies as to make its hiring explanation unworthy of belief." Porter v. Shah, 606 F.3d 809, 816 (D.C. Cir. 2010) (quoting Simms v. Oklahoma ex rel Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir.1999)) (internal quotation marks omitted). Sampson, moreover, has provided an explanation for the deviation from the normal, ten-day window, suggesting that she undertook "an expedited process" because "the team had no direct leader" while the position

19

remained vacant.  Sampson Dep. at 55-56.  Although Wright was serving as acting Supervisor in the interim, Sampson emphasized her belief that permanently filling the vacancy quickly was important.  See id. at 56-57.

What Plaintiff neglects to explain, furthermore, is how the deviation prejudiced her.  She knew about the vacancy, applied, and was one of two finalists.  A failure to publish the vacancy more broadly only helped her because it may have diminished the number of other potential candidates.  No harm to Plaintiff thus accrued from Sampson's decision.

Additionally, Plaintiff's suggestion that Sampson improperly "stacked" the panel is unsupported by evidence.  Plaintiff claims that Sampson "stacked the interview panel with her direct reports and employees who were aware of Ms. Bailey's prior complaint regarding Sampson's placement of Wright into the position," Pl.'s Reply at 5; however, she identifies only one panelist who was a "direct report" and one who was aware of the prior complaint.  See Pl.'s Mot. and Opp. at 4.  Sampson stated that she selected panelists from "all areas of HR," hoping to represent "a broad spectrum of opinions."  Sampson Dep. at 51.  Indeed, both parties acknowledge that the panel was racially diverse.  See Pl.'s Reply at 5; Def.'s Mot. at 17.  Plaintiff has thus not pointed to any internal guidelines or other evidence suggesting Sampson's selection of the panelists was improper.

Plaintiff's final claim that Sampson unduly influenced the panel is similarly undersupported. As a threshold matter, Plaintiff fails to explain exactly what she means by this allegation. Each panelist wrote down his or her scores and feedback on individual sheets, and each candidate was asked the same scripted questions.  See Sampson Dep. at 52.  Sampson testified without contradiction that she did not recall "mak[ing] any comments about Ms. Bailey or Ms. Wright after the last interview." Id. at 66.  Panelist Thompson recalls that she, and not

Sampson, was the first to share her impression of the candidates after the interviews and that there "was a general consensus at the table" that Wright was a better fit for the position. Thompson Dep. at 11-12. Indeed, Plaintiff herself acknowledges that Sampson "did not instruct the panelists how to evaluate the candidates." Pl.'s Mot. and Opp. at 4.

While Plaintiff relies heavily on Salazar v. WMATA, 401 F.3d 504 (D.C. Cir. 2005), to argue that a jury could infer pretext from Sampson's role in selecting the panelists and participation on the panel, Salazar turned on a fact not present in this case: the plaintiff in Salazar had been promised "a panel that [a particular supervisor] would have no hand in selecting." Id. at 508.   The Salazar court accordingly found that a reasonable jury could draw an inference of discrimination from the fact that the supervisor remained heavily involved in the selection process that had been "designed to exclude him." Id. at 509.  Here, however, Plaintiff provides no evidence tending to suggest that Sampson ought not to have been involved in the selection process or that she made any representations to Plaintiff to that effect.

Ultimately, a panel of racially diverse individuals made a judgment call that Wright was a better fit for the position than Plaintiff, and the Court will defer to that decision absent a viable showing of pretext.  As Plaintiff has failed to make such a showing, the Court concludes that there are no genuine issues of material fact that would warrant proceeding to trial.

**IV.    Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary

Judgment and deny Plaintiff's.  A separate Order consistent with this Opinion will be issued this day.

      **SO ORDERED**.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  9/16/2011